FRANK AND FREDA SCHOCHET, TRUSTEES OF INSTY-PRINTS, INC. NATIONAL ADVERTISING FUND TRUST, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schochet v. Commissioner
Docket No. 5493-79.
United States Tax Court
T.C. Memo 1982-416; 1982 Tax Ct. Memo LEXIS 326; 44 T.C.M. (CCH) 556; T.C.M. (RIA) 82416; July 26, 1982. *326 Petitioner is organized to collect monthly payments from franchisees of Insty-Prints, Inc. which payments are to be used solely for the advertising and promotion of the Insty-Prints business. Petitioner also earned interest on payments which were not currently expended by it. Held: Payments received by petitioner for advertising and promotion are not income to petitioner. Ford Dealers Advertising Fund, Inc. v. Commissioner,55 T.C. 761 (1971), affd. per curiam 456 F.2d 255 (5th Cir. 1972) and Seven-Up Co. v. Commissioner,14 T.C. 965 (1950) followed. Held further: Interest earned by petitioner is income. Held further: Petitioner is not entitled to deductions for advertising disbursements. Robert L. Lowe, for the petitioners. Dale L. Newland, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent has determined deficiencies in petitioners' Federal income tax as follows: Taxable Year
Deficiency
1969
[1] *327 $1,551.66
1970
[1] 3,593.12  1971
3,316.43
1972
8,529.79
1973
2,291.98
1974
4,223.45
1975
1,235.38
The issues for decision are whether amounts received by petitioner from the franchisees of Insty-Prints, Inc. to be expended for advertising and promotion are income and whether interest earned on such amounts is income. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Insty-Prints National Advertising Fund Trust (for convenience referred to hereafter as petitioner) is a trust [2] formed under the laws of Minnesota. Petitioner's trustees are Frank and Freda Schochet. Petitioner's principal office was in Minneapolis, Minnesota, at the time the petition was filed herein. Insty-Prints, Inc. (hereafter referred to as Insty-Prints) is a Minnesota corporation engaged in the business of franchising instant printing *328 or photocopying stores. Frank Schochet is the president of Insty-Prints. Frank and Freda Schochet own 65 percent of the common stock of Insty-Prints. Insty-Prints sold its first franchise sometime around October 1966. Under the typical Insty-Prints franchise agreement a franchise is granted covering a limited geographic area for 10 years (with an automatic 10-year renewal period unless notification of nonrenewal is made by either party) which allows the franchisee the right to use the tradename "Insty-Prints" and conduct an Insty-Prints business at a single location within the franchise area. The franchisor, Insty-Prints, is obligated to provide specified initial advice and training in the conduct of an Insty-Prints shop and specific continuing services to each franchisee. The franchisee is required to adopt and maintain certain business procedures and conduct a high-quality shop in accordance with Insty-Prints' standards. Insty-Prints receives three cents for each dollar of gross sales of the franchisee as a royalty. Article VII of the franchise agreement provides that any advertising done by a franchisee must be approved by Insty-Prints. Each franchisee is required to maintain *329 and expend a specified "local advertising budget." In addition, subparagraph (2)(c) of Article VII provides: [3] (c) No payment to the Insty-Prints national advertising fund need be made by the Franchisee during the first year the Franchisee opens, owns, and operates only one Insty-Prints licensed shop. Thereafter, Franchisee agrees to remit each month to the Franchisor or advertising agency designated by the Franchisor two percent (2%) of the previous months' [sic] gross sales on said Insty-Prints franchised shop, to the fund. If Franchisee opens, owns, and operates additional Insty-Prints franchised shops during the period this Franchise Agreement is in effect, Franchisee shall thereupon remit to Franchisor, or advertising agency designated by Franchisor, two percent (2%) of the previous months' [sic] gross sales on each of the additional Insty-Prints franchised shop units during the period that the Franchise Agreement is in effect. Thereafter, Franchisee need not make any *330 advertising fund payments on the first unit during the balance of the period the Franchise Agreement is in effect. This fund shall be used solely for group advertising and promotion for the benefit of all Franchisees. Expenditures from this fund shall be made with the approval of an advertising committee to be appointed by the Franchisor, which committee shall include three (3) Franchisees. This remittance shall be paid to the "Insty-Prints Advertising Account", and not to Insty-Prints, Inc., and shall be remitted on the 10th day of the month following said gross sales. The required payments to the Insty-Prints national advertising fund began in 1969 and were received by Insty-Prints, which created a separate ledger account for such payments on its corporate books. Insty-Prints segregated the advertising funds in a separate bank account. The advertising funds continued to be paid to Insty-Prints until 1973. On November 23, 1973, a trust agreement establishing the Insty-Prints National Advertising Fund (petitioner) was entered into by Insty-Prints, as grantor, and Frank and Freda Schochet, as trustees. The trust agreement provided in pertinent part as follows: TRUST AGREEMENT ESTABLISHING *331 THE INSTY-PRINTS NATIONAL ADVERTISING TRUST FUND This Trust Agreement is made by and between INSTY-PRINTS, INC., a Minnesota corporation, as grantor, and FRANK SCHOCHET and FREDA SCHOCHET, as trustee [sic]. WHEREAS, the grantor is engaged in the business of granting franchises for the conduct of INSTY-PRINTS businesses to numerous franchisees throughout the United States; and WHEREAS, pursuant to the terms of the franchise agreements the franchisees are required to pay a percentage of their monthly gross sales to the grantor for the purpose of funding group advertising and promotion of the INSTY-PRINTS business for the benefit of all INSTY-PRINTS franchisees; and WHEREAS, the grantor desires to establish a trust for the purpose of receiving, investing, administering, disbursing and accounting for said funds and other sums that may from time to time be allocated for such purposes by the grantor from its own funds or other sources. NOW, THEREFORE, the parties hereto hereby establish the INSTY-PRINTS NATIONAL ADVERTISING TRUST FUND, herein referred to as the "trust", upon the following terms and conditions: 1. SOURCES OF TRUST FUNDS
The grantor has transferred to the trust the sum *332 of $83,641.40 the receipt of which is hereby acknowledged by the trustee, which sum constitutes the balance in the INSTY-PRINTS, INC. advertising account as of November 23, 1973. The grantor shall transfer to the trust all funds received from its franchisees for group advertising and promotion of the INSTY-PRINTS business. The grantor may from time to time in its sole discretion allocate sums from its own funds or obtain sums from other sources for group advertising and promotion of the INSTY-PRINTS business and shall transfer all such sums to the trust. The trustee shall accept and add to the trust all such sums. 2. DISBURSEMENT OF TRUST FUNDS
The trustee shall disburse sums for group advertising and promotion of the INSTY-PRINTS business in accordance with instructions received by trustee from time to time from the INSTY-PRINTS Advertising Committee (the "committee"). [4] *333 The trustee shall have no duty to inquire as to the purposes of any disbursement nor any responsibility for disbursements made in accordance with instructions of the committee and may, without liability to the grantor or any beneficiary of the trust, rely on the instructions of the committee. 3. TRUSTEE
(n) Accounts, Reimbursement and Compensation of Trustee
The trustee shall submit an account of its receipts and disbursements at least annually to the grantor. If the grantor does not object in writing to the account of the trustee within 30 days after receipt thereof, such account shall be deemed accepted as prepared by the trustee and thereafter binding upon the grantor and each beneficiary of the trust and the trustee shall to the same extent as if such account were approved by a court of competent jurisdiction be deemed discharged and released of all liability to the grantor, the trust and the beneficiaries thereof with respect to the period of such account. If the trustee shall be compelled for any reason and at any time to pay any tax or penalty with respect to the trust, the trustee shall be reimbursed therefor from the trust, and if the trust is insufficient or terminated, the trustee shall be reimbursed therefor by the grantor.Before making any distribution of either income or principal the trustee may require a refunding agreement or may withhold distribution pending *334 determination of any tax liability. The trustee shall be reimbursed for all reasonable expenses incurred in the administration of a trust. The trustees named herein shall serve without compensation. Additional and successor trustees that are not employees of the grantor or beneficiaries of the trust (or owners or employees of beneficiaries) shall receive fair compensation for their services. 4. INVESTMENT POWERS
The trustee shall have the following powers relative to the investment and reinvestment of the trust property: (a) Power to Invest in Various Types of Assets
To invest and reinvest part or all of the trust property in any one or more of the following types of investments deemed by the trustee to be appropriate for the investment of the trust property: (1) common stocks, (2) investment company shares, (3) bonds, (4) mortgages, (5) notes, and (6) other similar property; (b) Powers Relative to Corporate Securities
To vote in person or by general or limited proxy, or refrain from voting, any corporate securities for any purpose; to purchase, exercise, waive or sell any subscription or conversion rights and any stock options, warrants or similar rights; to initiate, consent *335 to, participate in, oppose or take any other action with respect to any voting trusts, reorganizations, consolidations, mergers, recapitalizations, foreclosures, liquidations and dissolutions and in connection therewith to deposit securities and accept, hold or sell other securities or property received therefor; (c) Power to Purchase, Sell and Deal With Trust Property
To purchase and sell trust property at public or private sale, contract to purchase and sell, grant and acquire options to purchase and sell, exchange and otherwise deal with the trust property from time to time, for such price and upon such terms as the trustee deems appropriate; (d) Limited Liability of Trustee for Investment Decisions
Except for gross negligence and failure or refusal of the trustee to comply herewith, the trustee shall not be liable for any loss to or depreciation of the trust resulting from investing or reinvesting a larger proportion of the assets of the trust in common stocks, investment company shares, bonds, mortgages, notes or similar property than would an ordinary prudent trustee. 5. GENERAL POWERS
The trustee is further authorized during the term of the trust and for such reasonable time *336 thereafter as the trustee deems necessary: (a) Power to Borrow
To borrow without personal liability money in any amount from any lender, including the trustee individually, assume indebtedness, modify, extend or renew any existing indebtedness, even though obligations incurred by the trust may extend beyond the termination of the trust; (b) Power to Employ Agents and Professional Advisors
To employ agents, attorneys, auditors, financial and investment advisors and proxies (including members and partners of firms and partnerships of which a trustee is a member or partner) and delegate to them such powers, discretionary or otherwise, as the trustee deems desirable; (d) Power to Pay Taxes
To pay or compromise all taxes pertaining to the current administration of the trust, including interest and penalties thereon, if any, which may be assessed against it or against the trustee on account of a trust or the income thereof and to make any arrangement for the payment of any tax payable by any person with respect to any income of the trust, any tax payable with respect to the trust or any interest therein; (e) Power to Pay Expenses
To pay all costs, expenses and charges arising from the creation *337 or administration of, contributions to, or succession or interest in, the trust, including reasonable compensation to counsel and agents of the trustee, including members and partners of firms and partnerships of which a trustee is a member or partner; (f) Powers Relative to Claims by or Against the Trust
To compromise, contest, prosecute by litigation or arbitration or abandon claims in favor of or against the trust and to execute instruments containing releases, covenants, warranties, charges against the trust or trust property and excluding personal liability of the trustee; (i) Power to Select Accounting Methods and Periods
To select methods and periods of accounting and to determine whether and to what extent receipts and credits should be allocated to or apportioned between income or principal, including without limitation allocation and apportionment of discounts, premiums, interest, subscription rights, cash and stock dividends and other corporate distributions, whether ordinary or extraordinary, irrespective of any statement from the source of any such payment, and to determine whether and to what extent expenses, costs, taxes and charges of all kinds should be charged against *338 or apportioned between income and principal, including without limitation allocation and apportionment of the compensation of the trustee and other fees and charges, each such determination to be made in such manner as in the opinion of the trustee fairly reflects the essential character of the particular item being allocated, being guided but not bound by any applicable rules of the governing Principal and Income Act; 10. DEFINITIONS
(a) Beneficiary
The beneficiaries of the trust shall be all franchisees of the grantor and all INSTY-PRINTS businesses owned or controlled by the grantor. Neither the trust agreement nor the franchise agreement contain provisions for refunding unexpended amounts to the franchisees except that upon the trust's termination the trust agreement provides that any funds shall be returned to Insty-Prints, the grantor. The Insty-Prints Advertising Committee (hereinafter "the committee") consists of 12 members (6 each from Insty-Prints and its franchisees) appointed by Frank Schochet, Insty-Prints' president. [5] Members of the committee are not compensated for their services but are reimbursed for their travel expenses. [6]The committee makes all advertising *339 and promotion decisions. Petitioner retains no employees.Services are provided to petitioner through regular employees of Insty-Prints. In addition, Insty-Prints pays all the administrative expenses of petitioner. Petitioner has never owned or leases any real or personal property. The trust agreement makes no provision for dissolution upon the bankruptcy or withdrawal of a franchisee. Petitioner does not maintain separate accounts from each franchisee. Thus, a purchaser of an existing franchise would receive no credit for the selling franchisee's contributions to petitioner and would have to commence payments to petitioner pursuant to the franchise agreement. Petitioner placed some of the advances into an interestbearing savings account. Petitioner also purchased short-term (60 or 90 day) certificates of deposit with some of the funds, from which petitioner received interest. *340 Petitioner's receipts and disbursements for 1969 through 1975 are as follows: 1969
1970
1971
1972
Receipt from franchisees and/or
6,411.82
15,513.65
13,466.46
27,857.84
franchisor
Interest
420.35
1,608.22
3,454.22
Total Receipts
6,411.82
15,934.00
15,074.68
31,312.06
Accumulated Receipts from
6,411.82
21,925.47
35,391.93
63,249.77
Franchisees and/or Franchisor
Disbursements for Advertising
1973
1974
1975
Receipt from franchisees and/or franchisor
28,397.39
45,581.08
49,219.06
Interest
4,227.44
10,226.31
6,176.89
Total Receipts
32,624.83
55,807.39
55,395.95
Accumulated Receipts from Franchisees and/or
91,647.16
137,228.24
186,447.30
Franchisor
Disbursements for Advertising
19,024.91
36,609.89
56,341.44
Insty-Prints included receipts from franchisees for advertising as income in 1969 and 1970, pursuant to the advice of its accountants. Insty-Prints retained a different accounting firm sometime in 1970 and was advised by that firm that its prior accounting for advertising fund receipts was incorrect. Insty-Prints accordingly filed a refund claim which the Internal Revenue Service allowed. [7] Petitioner filed no tax return, nor did Insty-Prints file a corporate tax return, which included in income the $847.47 of tranchisee payments *341 made after September 30, 1970, and the $420.35 of interest earned on the advertising fund in 1970. Petitioner did not file any returns for 1971 nor 1972, nor did Insty-Prints file corporate income tax returns for the years ended September 30, 1971, and September 30, 1972, which included in income any contributions made to the advertising fund. [8] Petitioner has filed no returns for the years 1973, 1974, and 1975.
In the statutory notice of deficiency dated March 20, 1979, respondent determined that the moneys received from Insty-Prints franchisees for the advertising fund and interest were gross income. Rospondent further determined that petitioner's advertising expenses are deductible as provided by section 277. OPINION Petitioner asserts that the franchisee payments to the fund were held in trust for a specific purpose and thus were not gross income. Petitioner also maintains that interest received by the fund was similarly held in trust and was not gross income. Respondent contends that both the franchisee payments and interest are gross income to *342 the fund. Petitioner's contention concerning the taxable nature of franchisee payments rests upon a number of decisions of this and other courts, Ford Dealers Advertising Fund, Inc. v.Commissioner,55 T.C. 761 (1971), affd. per curiam 456 F.2d 255 (5th Cir. 1972); Dri-Powr Distributors Association Trust v. Commissioner,54 T.C. 460 (1970); Angelus Funeral Home v. Commissioner,47 T.C. 391 (1967), affd. 407 F.2d 210 (9th Cir. 1969); Broadcast Measurement Bureau, Inc. v. Commissioner,16 T.C. 988 (1951); Seven-Up Co. v. Commissioner,14 T.C. 965 (1950); Greater Pittsburgh Chrysler Dealers Association of Western Pennsylvania v. United States, an unreported case ( W.D. Pa. 1977, 39 AFTR 2d 77-1088, 77-1U.S.T.C. par. 9293). Respondent maintains that the fund is taxable as an association, as defined by section 7701 and the regulations promulgated thereunder, which must include in income payments made by its franchisee-members. In so doing, respondent argues that Seven-Up Co. and other cases relied upon by petitioner were incorrectly decided. In Seven-Up Co.,the Seven-Up Co. manufactured and sold extract for a soft drink to various franchised bottling companies (bottlers). Each bottler *343 was granted an exclusive sales territory by the Seven-Up Co. and controlled its own sales promotion and local advertising within that territory with the aid of the Seven-Up Co. Certain bottlers decided that it would be more efficient to conduct sales promotion and advertising of the beverage on a national level. In order to fund the national advertising campaign, participating bottlers were required to pay the Seven-Up Co. $17.50 per gallon of extract purchased. The funds were administered by the Seven-Up Co. and were to be spent solely for advertising purposes. The funds were accounted for separately on the company's books, but were not placed in a separate bank account. The Commissioner contended that the excess of the amounts received by the Seven-Up Co. over the expenses incurred and paid for national advertising constituted taxable income. In holding that the excess was not taxable we stated: The payments made by the participating bottlers were not for services rendered or to be rendered by petitioner. Neither were they part of the purchase price of the extract. They did not, therefore, constitute earnings received by petitioner under a claim of right and without restriction *344 as to disposition, which petitioner would have had to include in its gross income under the rule laid down in North American Oil Consolidated v. Burnet,286 U.S. 417. While petitioner had the right to receive the bottlers' contributions under its agreements with them, all the facts and circumstances surrounding the transaction clearly indicate that it was the intention of all of the parties concerned that these contributions were to be used to acquire national advertising for the 7-Up bottled beverage and for that purpose only, and that petitioner was to be a conduit for passing on the funds contributed to the advertising agency which was to arrange for and supply the national advertising. Cf. Central Life Assurance Society, Mutual v. Commissioner, 51 Fed. (2d) 939. Although the funds were not all expended in the year received, for reasons set forth in our findings, petitioner did expend them for national advertising, did not use them for general corporate purposes, treated the amounts on hand in the fund on its books as a liability to the bottlers, and considered itself, as evidenced by its letter of May 2, 1944, to one of the participating bottlers, merely as a trustee, handling *345 the bottlers' money. [14 T.C. at 977-978.] We have consistently applied the rationale of Seven-Up Co. in cases where the funds received were restricted in use to specified purposes and were so used. In Florists' Transworld Delivery Association v. Commissioner,67 T.C. 333 (1976), we held that amounts received from members which were obligated to be used for the cost of clearing intercity exchanges of flower orders and for national advertising were not includable in gross income. In so holding, we emphasized the restrictions upon the advanced funds. 67 T.C. at 345-346. Ford Dealers Advertising Fund, Inc. v. Commissioner,supra, involved funds received from franchised Ford dealers in the Jacksonville, Florida, area to be expended for advertising and promotion. The advertising fund also operated a "car-locator service" within the territory. Focusing again on the restricted uses of the funds we held that such funds were received in trust and did not represent gross income. Other cases in which we have applied the Seven-Up Co. rationale in finding that restricted funds received do not represent gross income include New York State Association of Real Estate Boards Group Insurance Fund v. Commissioner,54 T.C. 1325 (1970) *346 (receipts of an insurance trust established to acquire insurance for members at group rates); Dri-Powr Distributors Association Trust v. Commissioner,supra (amounts received by a sole proprietor-franchisor and an association to be expended for freight and advertising); Angelus Funeral Home v. Commissioner,supra (amounts received to be used solely for funeral services); and Broadcast Measurement Bureau, Inc. v. Commissioner,supra (funds received for the compilation and distribution of nationwide surveys measuring radio station and network audiences). In Greater Pittsburgh Chrysler Dealers Association of Western Pennsylvania v. United States,supra, franchised Chrysler dealers in the Pittsburgh area formed two nonprofit corporations which received $10 for each new car ordered by each dealer-member. These amounts were earmarked solely for advertising and promotion. The District Court applied the Seven-Up Co. rationale to hold that such amounts were not includable in the corporations' gross income. [9] *347 Where the amounts received were not restricted as to use or disposition, they have been held to constitute gross income. Krim-Ko Corp. v. Commissioner,16 T.C. 31 (1951).[10] In Krim-Ko Corp., the agreements placed no restrictions upon the use of the funds nor did they indicate that the recipient was to act "as a depository, conduit, trustee or agent with respect to [the funds]", 16 T.C. at 39. A great deal of respondent's effort is directed towards arguing that petitioner is an association (i.e., a corporation per section 7701(a)(3)) [11] and not a trust. Because petitioner is an association, asserts respondent, petitioner could not have acted as a trustee or agent with respect to the franchisees' payments and therefore such payments constitute gross income. Respondent also asserts that any advertising expenditures made by petitioner will be deductible subject to the provisions of section 277, which limits deductions of membership *348 organizations from transactions with their members to the extent of the income derived from their members. [12] *349 Respondent's position is thus that funds accumulated for a common purpose, such as advertising and promotion, constitute taxable entities from their inception, regardless of whether administered as a separate book entry, a trust, or a corporation, which are taxable on their receipts from members. [13] We do not agree. While petitioner resists respondent's attempts to classify it as an association, and thus a corporation, we do not perceive how the question of whether petitioner is taxable as a trust or an association *350 resolves the question of whether petitioner's receipts from its franchisee-members constitute gross income. We agree with petitioner that whether the fund is organized as a bookkeeping account, a trust, or an association, if the franchisee payments are sufficiently restricted as to use they are not gross income. Respondent points out that Seven-Up Co. and the other cases relied upon by petitioner have characterized nonprofit membership arrangements as "trustees, agents or conduits." Respondent argues that if petitioner is considered to be an association for tax purposes then such status is inconsistent with the traditional roles of trustees and agents, [14] relying on Morrissey v. Commissioner,296 U.S. 344 (1935) and section 301.7701-2, Income Tax Regs.
Respondent urges that petitioner could not be a trustee because the object of a traditional trust is to hold and conserve particular property. Respondent states that petitioner was formed with the objective of associating together in a joint enterprise for the transaction of business, not to serve as a traditional *351 trust, and thus petitioner could not be a trustee, section 301.7701-2(c)(2), Income Tax Regs. In so contending, respondent points to the Schochets' powers to determine the cost, type, and quantity of advertising and promotion and to select the agency to provide such advertising and promotion. Respondent characterizes petitioner's purposes as a "broad business purpose" and states that the Schochets were given "wide latitude" to fulfill those purposes. First, the Schochets, as trustees, were required by paragraph 2 of the trust agreement to disburse sums for advertising and promotion "in accordance with instructions received * * * from the [committee]." The only power held by the Schochets to control advertising decisions was not held by them as trustees, but only indirectly through Frank Schochet's appointments of committee members. A "wide latitude" of decision-making thus did not exist in the trustees, who were required to disburse funds to specified payees as dictated by the committee. This discretion does not destroy the nature of the advances. Ford Dealers Advertising Fund, Inc. v. Commissioner,supra at 772-773. Second, petitioner was not organized and operated for a "broad *352 business purpose." Petitioner's sole function and reason for existence was to collect payments for Insty-Prints advertising. Third, we see nothing inherently inconsistent in an association holding property as a "trustee" providing that its uses of such property are sufficiently restricted. City Gas Co. of Florida v. Commissioner,74 T.C. 386 (1980), on appeal (5th Cir., Oct. 24, 1980) (amounts received as customer security deposits); Growers Credit Corp. v. Commissioner,33 T.C. 981 (1960) (payments from stockholders to idemnify against credit and operating losses). Respondent's argument that petitioner cannot be considered as an agent of the franchisees is similarly grounded. Citing National Carbide Corp. v. Commissioner,336 U.S. 422 (1949), respondent contends that petitioner did not operate in the name and for the account of the franchisees, did not bind each franchisee by its actions and was not under the franchisees' control, which are the traditional earmarks of a principal-agent relationship. We note that petitioner was controlled in part by the franchisees, through the committee, and that each franchisee's contributions were committed by petitioner to advertising and promotion. *353 While perhaps all the classic factors of an agency relationship do not exist herein, nevertheless petitioner was formed and operated solely to act on behalf of the franchisees. We think that respondent has placed undue emphasis on our use in prior decisions of the terms "trustee" and "agent." By seeking to pigeonhole the traditional roles and duties of those fiduciaries and then to distinguish petitioner's roles and duties therefrom, respondent overlooks the fact that our use of such terms is in a broad sense. As we stated in Ford Dealers Advertising Fund, Inc. v. Commissioner,supra, at 773-774: While it is true that strictly speaking the funneling of funds to Advertising is not the equivalent of the flow of water through a conduit, the utilization of this analogy shows that an intermediary may be employed as a depository for funds in trust which are destined for an ultimate use that is specified within defined limits. The benefit, profit, or gain is not to accrue to the intermediary but rather to some other entity. The fact that no benefit, profit, or gain accrues to Advertising as an entity along with the fact that a trust relationship does exist, is the primary reason for exclusion *354 of the funds from gross income. This is the case here. Thus, even though the money is not required to be spent in one year, nevertheless, the sums remaining unspent, are still restricted to future use for advertising. Our use of terms such as "trustee," "agent," and "conduit" serves for purposes of analogy, not as a requirement of a specific legal relationship. We have found no authority in our prior decisions that accords significance to the form of the organization receiving the restricted payments. We have held such payments not to be income in the cases of an association ( Florists' Transworld Delivery Association v. Commissioner,supra;Ford Dealers Advertising Fund, Inc. v. Commissioner,supra;Angelus Funeral Home v. Commissioner,supra;Broadcast Measurement Bureau, Inc. v. Commissioner,supra), [15] *355 trust ( New York State Association of Real Estate Boards Group Insurance Fund v. Commissioner,supra), and a separate bookkeeping entry ( Seven-Up Co. v. Commissioner,supra). Accordingly, we find that the classification of petitioner as an association is irrelevant to our present purpose and we adhere to and reaffirm our holding in Seven-Up Co.[16]
Finally, respondent contends that the utilization of the Seven-Up Co. rationale by "nonprofit membership organizations" such as petitioner can result in serious tax abuse and difficulties of tax administration.Respondent emphasizes that members of such organizations are allowed current deductions for moneys which are not currently expended by the organization. Tax administration is hampered, concludes respondent, because no tax return is required by a trustee, agent, or conduit. Respondent also maintains that the Seven-Up Co. approach seemingly permits organizations that have failed to attain exempt status under section 501(c)(4) or 501(c)(6) [17] *357 to attain a more favorable status than if they had qualified under such *356 sections.
Nothing before us indicates manner in which the Insty-Prints franchisees treated their payments to Insty-Prints and, later, to petitioner. The case of the deductibility of such payments is not before us and we express no opinion thereupon. [18]
Respondent's concern over administrative difficulties is, presumably, related to the recordkeeping practices of funds like petitioner. While not present in the instant case, often the records kept by such funds provide for individual membership accounts. Florists' Transworld Delivery Association v. Commissioner,supra at 336; Dri-Powr Distributors Association Trust v. Commissioner,supra at 475; Seven-Up Co. v. Commissioner,supra at 974. Respondent's concern over administrative hardship is not supported by anything in this record. *358 Respondent does not suggest that the franchisees maintain inadequate records nor that petitioner's records are inadequate. Should respondent require such records, section 7602 provides respondent with a mechanism to obtain them. [19] *359 Lastly, the fact that a fund such as petitioner may not be required to qualify as a section 501(c)(4) or section 501(c)(6) organization (or may not be able to so qualify, n. 17, supra) does not have any bearing upon the taxable nature of the funds' receipts. Any inherent inequality in not requiring such funds to qualify for tax-exempt status should be addressed by the Congress and not this Court. Respondent has not argued that under the facts herein the franchisee payments are income under the standards of Seven-Up Co. The payments were limited to use for advertising and promotion, were expended for such purpose and not for others, and no profit accrued to petitioner from the funds. [20] *360 Accordingly, we hold that payments received by petitioner [21] from Insty-Prints franchisees to be used solely for advertising [22] are not income. Ford Dealers Advertising Fund, Inc. v. Commissioner,supra. Petitioner next contends that the interest earned upon the advances is not gross income because the interest, like the franchisee payments, can only be used for advertising purposes. Petitioner also maintains that should we find the interest to be income, then petitioner is entitled to deductions therefrom *361 in the years in which petitioner expended amounts for advertising (1973, 1974, and 1975). Petitioner contends that its advertising expenditures were first made from the interest, which petitioner characterizes as current income, and then from franchisee contributions, which petitioner characterizes as capital contributions. Respondent argues that regardless of whether petitioner is a trust or an association the interest earned on the advances is income to petitioner. Respondent further asserts that if we accept petitioner's argument concerning the nonincome nature of the franchisee payments then petitioner cannot deduct advertising expenditures. Respondent lastly maintains that if petitioner is properly taxed as a trust then no deduction is authorized for a trust's advertising expenditures. This issue appears to be one of first impression in cases involving funds such as petitioner. [23] *362 Petitioner asserts that with respect to the interest earned on the advances it was a conduit for such interest to be spent on advertising. [24] It is not at all clear that petitioner is required to pay out the interest on advertising. Paragraph 5(i) of the trust agreement provides that the trustees are authorized, in *363 relevant part: to determine whether and to what extent receipts and credits should be allocated to or apportioned between income or principal, including without limitation allocation and apportionment of * * * interest * * * and to determine whether and to what extent expenses, costs, taxes and charges of all kinds should be charged against or apportioned between income and principal, including without limitation allocation and apportionment of the compensation of the trustee and other fees and charges, each such determination to be made in such manner as in the opinion of the trustee fairly reflects the essential character of the particular item being allocated, being guided but not bound by any applicable rules of the governing Principal and Income Act [25] *364 ; The Uniform Principal and Income Act, as adopted by the State of Minnesota, provides that a trust is administered with due regard to the interest of the income *365 beneficiaries and remaindermen if receipts are allocated and expenditures charged by the trustee "in accordance with the terms of the trust instrument, notwithstanding contrary provisions of [the Uniform Principal and Income Act]." Paragraph 3(n) provides for reimbursement of the trustees and compensation to certain classes of trustees (trustees who are not Insty-Prints employees, franchisees or employees of franchisees). Paragraph 5(b) empowers the trustees "to employ agents, attorneys, auditors, financial and investment advisors and proxies * * *." Paragraph 5(e) empowers the trustees "to pay all costs, expenses and charges arising from the creation or administration of, contributions to, or succession or interest in, the trust, including reasonable compensation to counsel and agents of the trustee * * *." Paragraph 5(f) empowers the trustees "to compromise, contest, prosecute by litigation or arbitration or abandon claims in favor of or against the trust and to execute instruments containing releases, covenants, warranties, charges against the trust or trust property * * *." Therefore, under the provisions of the trust agreement and the laws of the State of Minnesota, petitioner *366 was clearly not required to expend the interest earned for advertising. Petitioner could use the interest to employ agents, pay expenses and resolve claims by or against petitioner. Accordingly, we hold that all interest earned on the advances is income to petitioner. [26]
Petitioner contends that if it is required to include the interest in income then it is entitled to matching deductions for advertising expenses of $4,227.44, $10,226.31 and $6,176.89 in 1973, 1974 and 1975, respectively. [27] Petitioner asserts that as to total advertising expenditures of $19,024.91, $36,609.89 and $56,341.44 for 1973, 1974 and 1975, respectively, the expenditures must be allocated first to interest and then the franchisee contributions. Respondent asserts that even if petitioner could show that it spent the interest for advertising no deduction is allowable to petitioner for such an expenditure. Petitioner *367 has not shown that it expended the interest earned, rather than the franchisee contributions, upon advertising. Rule 142(a), Tax Court Rules of Practice and Procedure. In each year that petitioner made advertising disbursements the sum of accumulated and current franchisee payments exceeded the advertising disbursements (p. 11. supra). In each of 1973 and 1974 the current payments from franchisees exceeded that year's advertising expenses (p. 11, supra). Based on these facts, we find that petitioner is not entitled to advertising deductions from its interest income. [28]
To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Respondent has conceded that the statute of limitations bars respondent's assertion of any deficiency for the year ended December 31, 1969, to the extent of $14,666.18 in franchise payments which were made prior to September 30, 1970, and were reported on Insty-Prints' corporate tax return for the year ended September 30, 1970.
2. Respondent has not stipulated that petitioner is a trust for Federal income tax purposes, nor is the use of the term "trust" herein intended to characterize petitioner for such purposes.↩
3. Subparagraphs (2)(a) and (2)(b) of Article VII establish guidelines for the franchisee's local advertising fund. No mention of the Insty-Prints national advertising fund is made prior to subparagraph (2)(c).↩
4. Article VII, Subparagraph (2)(c), supra,↩ of the Franchise Agreement establishes the Insty-Prints Advertising Committee.
5. The franchise agreement calls only for three franchise members out of an unspecified number of committee members. This difference is not explained in the record. ↩
6. It is unclear whether petitioner or Insty-Prints reimburses the committee's members. Apparently all committee meetings are held in Minneapolis.↩
7. See fn 1, supra.↩
8. Apparently neither Insty-Prints nor petitioner has ever reported interest earned on the advertising fund as income.↩
9. See also North Carolina Oil Jobbers Association, Inc. v. United States, an unreported case ( E.D. N.C. 1978, 42 AFTR 2d 78-5848, 78-2U.S.T.C. par. 9658) and Burley Tobacco Growers Cooperative Association, Inc. v. United States, an unreported case ( E.D. Ky. 1968, 22 AFTR 2d 5146↩, 68-2U.S.T.C. par. 9458).
10. See also Lake Petersburg Association v. Commissioner,T.C. Memo. 1974-55 and P.F. Scheidelman & Sons, Inc. v. Commissioner,T.C. Memo. 1965-31↩.
11. Unless otherwise provided, all section references are to the Internal Revenue Code of 1954, as amended, and in effect during the years in issue. ↩
12. See Rev. Rul. 74-318, 1974-2 C.B. 14, in which the Commissioner filed a nonacquiscence to Ford Dealers Advertising Fund, Inc. v. Commissioner,55 T.C. 761 (1971), and to Broadcast Measurement Bureau, Inc. v. Commissioner,16 T.C. 988 (1951), and Rev. Rul. 74-319, 1974-2 C.B. 15, in which the Commissioner acquiesced in the result only in Seven-Up Co. v. Commissioner,14 T.C. 965 (1950), and concluded that an unincorporated organization formed to conduct a nationwide advertising campaign for the benefit of franchised auto dealers constitutes an association under section 7701 (a)(3). Rev. Rul. 74-319 concludes that the members' payments are income to the association and any advertising expenditures by the association would be deductible subject to section 277's limits. The result of respondent's theory is thus to tax the annual excess of member contributions over the organization's expenditures. We noted in Florists' Transworld Delivery Association v. Commissioner,67 T.C. 333 (1976) that even should members' payments be gross income an accrual method recipient may be entitled to a matching deduction, 67 T.C.. at 347. Where a cash method recipient is involved a matching deduction would not exist, 67 T.C. at 347↩, n. 20. 13. This would explain why the notice of deficiency herein, covering 1969 through 1975, was issued to petitioner although the trust was not created until November of 1973. Prior to that time franchisee payments to the advertising fund were made to Insty-Prints. Consistent with respondent's acquiescence in the result of Seven-Up Co.↩ no notice of deficiency was issued to Insty-Prints.
14. Respondent has stated no reason why association status should preclude treating petitioner as a "conduit" of the funds.↩
15. See also Dri-Powr Distributors Association Trust v. Commissioner,54 T.C. 460 (1970), in which the petitioner organized as a trust, conceded that it was an association taxable as a corporation pursuant to section 7701(a)(3), 54 T.C. at 478↩. We accorded no significance to that concession. 16. Respondent also asserts that petitioner must be viewed as a separate taxable entity under the doctrine of Moline Properties, Inc. v. Commissioner,319 U.S. 436↩ (1943). This is a corollary to respondent's trustee and agent arguments and is also of no relevance herein.
17. Section 501(a) states, in part, that an organization described in section 501(c) shall be exempt from taxation unless exemption is denied under sections 502 or 503: Section 501(c)(4) organizations are: Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees, the membership of which is limited to the employees of a designated person or persons in a particular municipality, and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes. Section 501(c)(6) organizations are: Business leagues, chambers of commerce, real-estate boards, boards of trade, or professional football leagues (whether or not administering a pension fund for football players), not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual. Petitioner has not asserted that it is an organization described either in section 501(c)(4) or 501(c)(6). But see National Muffler Dealers Association, Inc. v. United States,440 U.S. 472 (1979) (trade organization confined to franchised dealers of Midas International Corp. not a "business league" exempt under section 501(c)(6)), and New York State Association of Real Estate Boards Group Insurance Fund v. Commissioner,54 T.C. 1325↩ (1970) (insurance trust established to acquire group insurance rates for its members not exempt under section 501(c)(4)).
18. Compare Waring Products Corp. v. Commissioner,27 T.C. 921 (1957) with Herman Chevrolet, Inc. v. Commissioner,39 T.C. 846↩ (1963).
19. SEC. 7602. EXAMINATION OF BOOKS AND WITNESSES. For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary is authorized-- (1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry; (2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary may deem proper, to appear before the Secretary at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and (3) To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry.↩
20. The receipt of interest on the funds does not in and of itself render such funds taxable, see Florists' Transword Delivery Association v. Commissioner,supra↩ at 346, n. 18 and cases cited therein. 21. We note that under Paragraph VII(c) of the franchise agreement franchisee payments may also be made directly to the "advertising agency designated by [INSTY-PRINTS]." The trust agreement does not mention the possibility of franchisee payments being made directly to an advertising agency. ↩
22. Respondent does not contend that the trustee's investment powers created in paragraph 4 of the trust agreement fall outside the boundaries of Seven-Up Co.↩ and similar cases. We note that prior to November 23, 1973 (when the trust was executed) such powers did not exist. In any event, the investment powers appear to be merely incidental to petitioner's purpose and could be effectively negated upon the committee's exercise of its power to direct expenditure of the funds.
23. In Florists' Transworld Delivery Association v. Commissioner,supra at 339; Ford Dealers Advertising Fund, Inc. v. Commissioner,55 T.C. 761, 770 n. 1 (1971), affd. per curiam 456 F.2d 255 (5th Cir. 1972); New York State Association of Real Estate Boards Group Insurance Fund v. Commissioner,supra at 1333 n. 6; and Angelus Funeral Home v. Commissioner,47 T.C. 391, 397 n. 4 (1967), affd. 407 F.2d 210↩ (9th Cir. 1969), each taxpayer earned interest on the advances which was reported as income. 24. While not stated by petitioner the fictional operation of this theory would be the payment of interest by the borrowers through petitioner and to the franchisees. The franchisees would then be deemed to pay the interest received to petitioner for use solely for advertising. Implicit in petitioner's theory is the argument that the franchisees, and not petitioner, are taxable upon the interest. Taxation of the franchisees upon the interest earned on their payments to petitioner is irreconcilable with the allowance of a current deduction to the franchisees on the basis of their relinquishment of control over such payments. Herman Chevrolet, Inc. v. Commissioner,supra,↩ n. 15.
25. Minn. Stat. Ann. sections 501.48 to 501.63, effective January 1, 1970, contain the Minnesota version of the Uniform Principal and Income Act.Minn. Stat. Ann. section 501.49 provides: 501.49 Duty of trustee as to receipts and expenditure Subdivision 1.A trust shall be administered with due regard to the respective interests of income beneficiaries and remaindermen. A trust is so administered with respect to the allocation of receipts and expenditures if a receipt is credited or an expenditure is charged to income or principal or partly to each (a) in accordance with the terms of the trust instrument, notwithstanding contrary provisions of sections 501.48 to 501.63; (b) in the absence of any contrary terms of the trust instrument, in accordance with the provisions of sections 501.48 to 501.63; or (c) if neither of the preceding rules of administration is applicable, in accordance with what is reasonable and equitable in view of the interests of those entitled to income as well as of those entitled to principal, and in view of the manner in which men of ordinary prudence, discretion and judgment would act in the management of their own affairs. Subd. 2. If the trust instrument gives the trustee discretion in crediting a receipt or charging an expenditure to income or principal or partly to each, no reference of imprudence or partiality arises from the fact that the trustee has made an allocation contrary to a provision of sections 501.48 to 501.63↩.
26. We express no opinion as to whether the interest would have constituted income to petitioner if its use had been restricted solely for advertising.↩
27. Petitioner made no advertising disbursements in 1971 and 1972 and accordingly does not contend that any deductions are allowable for those years.↩
28. We express no opinion as to whether petitioner would be entitled to a deduction for advertising payments made from interest income.↩